UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

TILTON R. HUNTER, JR.                           CIVIL ACTION

VERSUS                                          NUMBER: 17-05070

GEICO GENERAL INSURANCE                         SECTION: "S"(5)
COMPANY

## ORDER AND REASONS

Before the Court are two related motions, the "Motion for an Order for Sanctions, Attorney Fees, Perjury, and to Reschedule the Depositions and Conduct Them in Chambers" and the "Motion for an Order for Relieve *[sic]* Pursuant to Federal Rules of Civil Procedure Rule 37(b)(2)," filed by Plaintiff, Tilton R. Hunter, Jr. ("Hunter").[1]  (Rec. docs. 40, 42).  Each of these motions was accompanied by a request for expedited hearing, which the Court granted.  (Rec. docs. 41, 43, 46).  Defendant, GEICO General Insurance Company ("GEICO"), filed a combined response to the motions (rec. doc. 51) and the Court heard oral argument August 1, 2018.  Following that oral argument, the Court issued an order requiring both parties to submit supplemental memoranda addressing the following specific topics:

> (1) Whether GEICO and/or [its counsel, Stephen] Barry should be sanctioned under Rule 30 of the Federal Rules of Civil Procedure for impeding, delaying, or frustrating the fair examination of the deponent, Adam Vincent;
>
> (2) Whether GEICO should be sanctioned for presenting a witness pursuant to Rule 30(b)(6) who was not properly prepared to testify to the topics in the deposition notice;
>
> (3) Whether an appropriate sanction would be ordering either or both depositions reconvened in the undersigned's courtroom;
>
> (4) Whether GEICO should be ordered to pay any fees or costs associated with either deposition;

---

[1]  Hunter, a licensed attorney, is proceeding *pro se* in this matter.

(5) Whether any or all of the "Claim Notes" identified on GEICO's privilege log (rec. doc. 13-4) are, in fact, subject to the work product privilege. If so, why and if not, why not?

(6) If subject to the work product privilege, has Plaintiff demonstrated substantial need for the materials and that he cannot, without undue hardship, obtain their substantial equivalent by other means, such that the materials should be discoverable.

(Rec. doc. 52).

Both parties filed their supplemental memoranda (rec. docs. 56, 57) and the Court held a second hearing on September 6, 2018. (Rec. doc. 68).

Based upon the pleadings and attachments thereto (in particular the deposition transcripts of GEICO's adjuster, Adam Michael Vincent ("Vincent") and its Rule 30(b)(6) designee, Cheryl Yvette Holland ("Holland")), and the arguments of the parties, the Court rules as follows.

## I. BACKGROUND

This case arises from an automobile accident that occurred on April 21, 2015 involving Hunter and another driver, John Gallagher ("Gallagher"). Hunter made a claim against Gallagher's insurer, Liberty Mutual, and settled that claim for policy limits of $25,000. Thereafter, Hunter made a demand against his own carrier, GEICO, under his uninsured motorist coverage. Although GEICO has made certain unconditional payments to Hunter, there remains a dispute between the parties whether additional amounts are owed him, a dispute that has resulted in this litigation, in which Hunter also seeks penalties and attorneys' fees for "bad faith" pursuant to Louisiana Revised Statutes Sections 22:1892 and 1973.

The District Judge originally set a discovery deadline of June 22, 2018. (Rec. doc. 11, p. 2). Prior to that deadline, GEICO filed a motion for partial summary judgment seeking dismissal of Hunter's bad-faith claims. (Rec. doc. 15). Hunter filed a response, arguing in part that "dismissal of these claims prior to Plaintiff receiving discovery responses and deposing Mr. Vincent would be premature." (Rec. doc. 19). Hunter thereafter filed a "Motion to Extend the Scheduling Order Cutoff Date for Witness/Exhibit Lists, Depositions, and Discovery" (rec. doc. 23), which the District Judge granted, extending the discovery deadline to July 30, 2018. (Rec. doc. 30).

In the interim, Hunter had sought to take the depositions of Vincent (the adjuster)[2] and GEICO's corporate representative pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure. (Rec. doc. 13). GEICO resisted both depositions. The Court ordered the 30(b)(6) deposition to go forward in a minute entry issued on June 13, 2018 (rec. doc. 26) and ordered Vincent's deposition to go forward in a telephone conference convened by the Court in response to an email request from Hunter. (Rec. doc. 48-1).

The depositions went forward on July 20, 2018. During the Vincent deposition, counsel – Hunter and Stephen R. Barry ("Barry") for GEICO – yet again called the Court for guidance concerning Vincent's claim notes.[3] The Court provided certain guidance to the parties and directed them to continue with the deposition. Most notable for present purposes, the Court directed Hunter and Barry that speaking objections were prohibited and that objections to form should be stated only as "Objection, form" going forward.

---

[2] Hunter first asked GEICO to produce Vincent for a deposition on January 5, 2018. (Rec. doc. 13-4).
[3] While the Court believed at the time that the telephone conference was being transcribed by the court reporter present for the deposition, subsequent review of the transcript indicates that the conference was not transcribed.

Following the depositions, Hunter filed the present motions, complaining that Barry was guilty of "prolonging Mr. Vincent's deposition with long speaking objections" as part of a plan to "prolong Mr. Vincent's deposition to prevent the corporate representative's testimony." (Rec. doc. 40-1). Hunter also complained that the company's 30(b)(6) designee, Holland, "was unable to answer any questions, because she did not know anything about the claim." (*Id.*). Both deposition transcripts were attached to the motions in their entirety. (Rec. doc. 40-3 and 4).

In response to the motions, GEICO raised a number of complaints regarding Plaintiff's motions and the arguments therein, including that Hunter failed to sign his memoranda in support of the motions.[4] (Rec. doc. 51). GEICO also complained that Hunter routinely emailed the Court and GEICO's counsel concerning discovery disputes, which it believes is not "proper procedure to resolve discovery disputes." (Rec. doc. 51 at p. 5). As to the merits of Hunter's motions, GEICO claimed that Hunter was provided a full opportunity to question both Vincent and Holland and that "both depositions were concluded voluntarily by the plaintiff when he had no additional questions to ask." (*Id.* at p. 12). GEICO also denies that

---

[4] At the hearing, the Court explained to Hunter that both the motion <u>and</u> memoranda had to be signed by the person filing them. To remedy any perceived concern that his memoranda failed to comply with Rule 11 in this regard, the Court conducted the following colloquy with Hunter at the beginning of the hearing:

> THE COURT: [a]s a plaintiff and as an officer of the court, do you certify under Rule 11 that to the best of your knowledge, information, and belief formed after an inquiry under the circumstances that the motions that you just filed are not being presented for any improper purpose?
> MR. HUNTER: Yes, I do, Your Honor.
> . . . .
> THE COURT: All right. Let me ask you two more questions. Do you certify that the claims in the motion are warranted under existing law?
> MR. HUNTER: Yes, I do, Your Honor.
> THE COURT: Do you certify that the factual contentions have evidentiary support?
> MR. HUNTER: Yes, I do, Your Honor.
> THE COURT: Okay. I'm going to accept those representations for our purposes today and for the purposes of these motions.

(Rec. doc. 61 at p. 4).

Barry employed speaking objections throughout the Vincent deposition and did not attempt to prolong that deposition to prevent the deposition of Holland.  (*Id.*).

Finally, GEICO complains of Hunter's "unsupported accusations of perjury and deceit."  (*Id.* at p. 11).

## II.     LAW AND ANALYSIS – THE VINCENT AND HOLLAND DEPOSITIONS

### A.   *Relevant Law on Sanctions and Deposition Conduct*

There are numerous mechanisms by which district courts exercise their sanction powers, including the Federal Rules of Civil Procedure (through Rules 11, 26, 30 and/or 37); 28 U.S.C. §1927; and the inherent power of the courts to manage their own proceedings and to control the conduct of those who appear before them.  Regardless of the source, it is widely accepted that the primary purpose of sanctions is to deter frivolous litigation and abusive tactics.  Sanctions seek to deter both the culpable attorney and members of the bar in general. *See, e.g., Pavelic & LeFlore v. Marvel Entertainment Group*, 493 U.S. 120, 126-27, 110 S.Ct. 456, 459-60 (1989)(the primary purpose of Rule 11 is deterrence, not compensation); *Fred A. Smith Lumber Co. v. Edidin*, 845 F.2d 750, 752 (7th Cir. 1988)("the most important purpose of Rule 11 sanctions is to deter frivolous litigation and the abusive practices of attorneys"); Gregory P. Joseph, Sanctions: The Federal Law of Litigation Abuse §47(A)(2d ed.)(the purpose of Rule 37 is four-fold: "(1) penalizing the culpable party or attorney; (2) deterring others from engaging in similar conduct; (3) compensating the court and other parties for the expense caused by the abusive conduct; and (4) compelling discovery"); *Id.* at §20 (the purpose of 28 U.S.C. §1927 is to deter unnecessary delays in litigation).

Whether a district court exercises its sanction powers under the Federal Rules of Civil Procedure, 28 U.S.C. §1927, or its inherent power, it does so at its "broad discretion."

*Topalian v. Ehrman,* 3 F.3d 931, 934 (5th Cir. 1993).  "The discretion vested in the trial court is granted so its thoughtful exercise will carry out the educational and deterrent functions of the rule."  *Jennings v. Joshua I.S.D.*, 948 F.2d 194, 199 (5th Cir. 1991), *cert. denied*, 504 U.S. 956, 112 S.Ct. 2303 (1992).

Because the present motions concern the conduct of counsel during depositions, they are properly analyzed under Rule 30 and the cases construing it.  Rule 30(c)(1) provides that "[t]he examination and cross-examination of a deponent proceed as they would at trial under the Federal Rules of Evidence...."  Fed.R.Civ.P. 30(c)(1).  Objections made during depositions "must be stated concisely in a nonargumentative and nonsuggestive manner" and counsel may instruct a deponent not to answer "only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3)."  *Id.*

"Depositions frequently have been unduly prolonged, if not unfairly frustrated, by lengthy objections and colloquy, often suggesting how the deponent should respond."  Rule 30, 1993 Advisory Committee Note.  In such instances, "[t]he court may impose an appropriate sanction—including the reasonable expenses and attorney's fees incurred by any party—on a person who impedes, delays, or frustrates the fair examination of the deponent."  *Id.*

> As officers of the court, counsel are expected to conduct themselves in a professional manner during a deposition.  A deposition is intended to permit discovery of information in the possession of the deponent or perpetuate the testimony of the deponent.  In either case, it is to be conducted in a manner that simulates the dignified and serious atmosphere of the courtroom.  Thus, the witness is placed under oath and a court reporter is present.  Conduct that is not permissible in the courtroom during the questioning of a witness is ordinarily not permissible at a deposition ....
>
> *Bordelon Marine, Inc. v. F/V KENNY BOY*,

No. 09-CV-3209, 2011 WL 164636 at *5
(E.D. La. Jan. 9, 2011)(*citing Ethicon Endo–Surgery v. U.S. Surgical Corp.*, 160 F.R.D. 98, 99 (S.D. Ohio 1995)).

Depositions are to be limited to what they were and are intended to be:  question-and-answer sessions between a lawyer and a witness aimed at uncovering the facts in a lawsuit. When a deposition becomes something other than that because of the strategic interruptions, suggestions, statements, and arguments of counsel, it not only becomes unnecessarily long, but it ceases to serve the purpose of the Federal Rules of Civil Procedure: to find and fix the truth.

*Hall v. Clifton Precision, a Div. of Litton Systems, Inc.,* 150 F.R.D. 525, 528 (E.D. Pa. 1993).

With these notions in mind, the Court turns to the two depositions at issue here.

*B.  The Vincent Deposition*

At the outset, the Court notes that it held multiple hearings in this matter, in order to give GEICO and Barry a full and complete opportunity to be heard on the serious allegations presented in Plaintiff's motions.  At the beginning of the second hearing on September 6, 2018, Barry addressed the Court concerning his conduct at the Vincent and Holland depositions.  He acknowledged his overzealousness and sincerely apologized to the Court and to Hunter.  The Court accepted that apology and credits Barry for acknowledging that he stepped over the line during the Vincent deposition.

The Court has reviewed the Vincent transcript numerous times; it was a disheartening exercise.  In a transcript totaling 194 pages in a deposition he was defending, Barry appears on an astonishing 172 pages.[5]  In 185 pages of cross examination by Hunter,

---

[5]  Owing to the inclusion of a number of "certified" questions at the beginning of the transcript, the actual testimony begins at page 10.

Barry objects an almost superhuman 208 times. The result was a deposition transcript polluted with verbose and improper objections, argumentative and condescending lecturing of opposing counsel, and pervasive obstruction.

Page upon page of unending speaking objections and improper instructions to the witness greet the reader of this transcript. Objections so long that the objector objected eight times that his objections were being interrupted by opposing counsel. Even arguably proper objections were often accompanied by interminably long and haranguing explications for the ostensible benefit of the hapless questioner, who in fact needed no such assistance. Most of the questions were fine. Throughout the deposition, Hunter repeatedly asked Barry to stop making speaking objections to no avail – Barry persisted. The omnipresence of his lengthy objections and speeches make the deposition often unreadable and virtually useless for any legitimate purpose at trial.

How, for instance, is one supposed to make heads or tails of this <u>10-page</u> exchange:

BY MR. HUNTER:

Q  Okay. When you received the initial medical records with the claim -- with my claim, did you make notes in – in -- in the claim file?

MR. BARRY: Object to the form.

THE WITNESS: I don't recall what notes were made, but I'm sure I made some sort of a note.

BY MR. HUNTER:

Q  If you had those notes, would it help you to remember what you received and what you reviewed?

MR. BARRY:  Object to the form. You've -- you've been produced -- everything that you're entitled to has been produced, and Judge North has ruled on that two times already, most recently

on our last phone call.  He told you specifically everything that you're entitled to has been produced so –

MR. HUNTER:  So you...

MR. BARRY: -- that's the end of that question.

MR. HUNTER:  Okay. Now that's not the end of it unless you're instructing him not to answer.

MR. BARRY:  If you have some records you'd like to show him, show him the records. Judge North...

MR. HUNTER:  Are you instructing him not to answer my questions?

MR. BARRY:  Judge North said specifically:  We're not required to bring any documents to the deposition.  Judge North said to you...

MR. HUNTER: I'm not asking him...

MR. BARRY: No, don't interrupt me.  Don't interrupt me.  Don't interrupt me.

MR. HUNTER:  You're interrupting me.

MR. BARRY:  No, I was...

MR. HUNTER:  You're interrupting me.  You're interrupting my question.

MR. BARRY:  You said -- say what you're going to say, and then I'm going to say my part.

MR. HUNTER: Okay.

MR. BARRY:  And we're going to get through that, and then you can go.

MR. HUNTER: And my question is...

MR. BARRY:  One person can talk at a time.

MR. HUNTER:  My question is going to be answered, or you're going to direct him not to answer the question.

MR. BARRY:  Are you done talking?  Because I want to finish my objection.  And politely we each take turns.  So all I'm asking you to do is let me finish what I'm saying. I'm not talking over you.  Please don't talk over me.  My position is, and it's supported by the ruling of the Court; and, that is, Judge North reviewed these, did a Motion to Compel Hearing.  You were entitled to documents. You received those documents.  Then we had another recent phone conference with the Judge on Wednesday or Tuesday – pardon me -- Tuesday of this week, two days ago or three days ago.  And Judge North said that, one, you have all the documents because you wanted us to bring documents.  You have all the documents you're going to get.  And, two, bring all the documents that you need to ask questions at the deposition to the deposition.  And it was understood both in letters that I sent you and with the Court that we wouldn't be bringing anything.  So if you're going to ask him questions about specific documents.  Because he's a fact witness that's off his memory, you need to show the witness the documents that would refresh his recollection.  That's how somebody remembers something by you presenting them with the documents.  Not by going in and trying to have him do something that the Court's already told you on two occasions he's not required to do.  What? You're looking at me, but I think you're just -- you're trying to ask a question now.

MR. HUNTER: Well, I'm just waiting to make sure you're finished.

MR. BARRY: I'm done.

A  (No response.)

BY MR. HUNTER:

Q  My question is, you made notes regarding the medicals.  My question is -- and you said you don't remember specifically what was there, what was -- what was -- what was in -- in the notes that you took. My question is, if you had those notes, would it refresh your memory?

MR. BARRY:  Let me also object because that does not restate accurately his prior testimony.  If you can answer.

THE WITNESS: I really don't know how to answer.  I'm sorry.

BY MR. HUNTER:

Q  Okay. Do you understand the question?

A  I -- I -- I -- again, I'm sorry. I'm a little lost but –

Q  Sorry about all this lawyering going on –

A  -- I guess I stated...

Q  -- I mean at the deposition.  I'm just trying to ask you questions about what you know, what you recall.  And if you don't recall it, I'm trying to have things to refresh your memory. And my question is to you, if you had your notes in front of you, would you be able to -- would -- would that help you remember what medical records you reviewed and what you -- what your thoughts were at the time?

MR. BARRY: Let me interpose my same objection from before. And that is in violation of the Court's order.  The Court has already said that...

MR. HUNTER: That's -- I'm not asking him to produce anything.

MR. BARRY:  This is the part where you -- this is the part where you interrupt me again, and you don't understand why I asked you to simply wait till I'm finished.  You're asking him the same thing that Judge North already told you both at two separate hearings that you're not entitled to. You disagree with that.  I get that.  But you can't -- but the Court's already ruled, and the Judge ruled that you have to bring everything to the deposition; that he's not required to bring anything to the deposition.  So you're asking a person to -- off the top of his head to remember your demand package, and you won't show it to him.  So he's not required to bring anything.  You have it.  You were – you knew that this deposition was taking place today.  And if you're not going to show it to him, you're not going to show it to him.  But it's not fair to question the witness about medical records you refuse to show him.  So it's not surprising that he doesn't remember it.  And you can't get other records just by refusing to do what the Court told you you're supposed to do.

A  (No response.)

BY MR. HUNTER:

Q  Let me make this clear.  I am not asking you to produce anything. I am not asking you if -- I'm not asking you to bring anything to the deposition.  I didn't – I totally understood.  I am not asking you to bring anything.  I'm not asking you to produce anything.  My question to you is, do those notes exist?  Do you have notes about when you got the initial medical records and your evaluation and review of those records?

MR. BARRY: Let me also say this.

A  (No response.)

BY MR. HUNTER:

Q  That's all I'm asking you.

A  (No response.)

MR. BARRY:  Let me also say this; that Judge North reviewed the privileged log.  You -- I know you're looking away, and you're -- and you're aggravated by the fact.  But this is -- my job is protect the privilege.  We submitted to the Court a privileged log that contained log notes pursuant to the Court's order.  We did that.  The Judge determined that they're privileged; so, therefore, you are not entitled to discover items that the Court has previously ruled are privileged.  And I'm not going to let the witness testify with regard to privileged matters.  But you are entitled to ask the witness what he thinks of your records. No, that's – but that's not what you've asked.

MR. HUNTER:  I'm -- I'm -- I can't...

MR. BARRY:  You want to get into privileged matters and I'm sorry. You're not allowed to do that.

MR. HUNTER:  I am not -- I'm not trying to get any documents.  I am simply asking the witness if there are notes associated with his review of the medical records.

MR. BARRY:  And my answer is that -- and my response is that –

MR. HUNTER:  He says that...

MR. BARRY: -- we had produced privileged documents to the Court that the Court has reviewed in-camera and made a ruling

on that they were privileged. And, therefore, asking a witness about privileged matters is not appropriate. I'm sorry.

MR. HUNTER: So are you testifying that, yes, there are notes but I'm not entitled to it?

MR. BARRY: I'm testifying to nothing. I'm not the witness.

MR. HUNTER: It sounds like you're testifying because I asked the witness. I asked the witness: Are there notes? I didn't ask him for the notes. I didn't ask him to produce the notes. I'm asking: Are there notes?

MR. BARRY: I believe your question goes to the substance of notes; and, therefore, we object to any questioning that gets to privileged matters particularly since the Court has already ruled on matters that are privileged.

MR. HUNTER: I will -- what I'm going to do is, I'm going to reserve my right to re-question the witness at a later time after the Court decides whether or not he should answer this question.

MR. BARRY: I think you need to ask your question because I've never instructed anybody...

MR. HUNTER: I've already done it.

MR. BARRY: Okay. So then you must be satisfied with your response. Is that your last question for this witness?

MR. HUNTER: Not even close.

MR. BARRY: Well, why don't we take a quick break. Is that all right?

MR. HUNTER: That's fine.

(Rec. doc. 40-3 at pp. 57-66).

The Court takes note of how this lengthy exchange started – with a straightforward question to an insurance adjuster whether he made notes in a claims file when he received medical records. It is inexcusable that such an anodyne question would precipitate what

followed.  GEICO's (or Barry's) explanation for his pique is unsatisfying.  At no time during this exchange did Hunter ask to see a privileged document, ask what was in a privileged document, or ask Vincent to recite what was in a privileged document – points Hunter repeatedly emphasized.  Rather, he asked whether Vincent made notes in a claims file.  When Vincent testified that he could not recall, Hunter asked Vincent whether, if he had those notes in front of him, his recollection as to the first question would be refreshed.

How anyone could consider these questions improper eludes the Court.  How the questions could elicit Barry's particular reaction is even more mystifying.  That reaction included a lengthy set of speaking objections, complaints about being interrupted during those speaking objections, suggestions to Hunter on how to re-ask his questions to suit Barry's preference, improperly instructing the witness not to answer, and misstating this Court's rulings.[6]  If Hunter had asked for documents to be produced, that would have been objectionable based on the Court's prior rulings.  If Hunter had asked Vincent to read the contents of those documents into the record, that would have been objectionable based on the same rulings.  Barry never let him get that far.

This discussion only touches on one exchange in the deposition.  As noted above, Barry lodged over 200 objections in 185 pages of cross examination.  Among the myriad problems with those objections are countless speaking objections, numerous instances of

---

[6]  Barry insisted that Hunter was "asking him the same thing that Judge North already told you both at two separate hearings that you're not entitled to." (*Id.* at p. 62).  Most assuredly, Judge North did not tell a bad-faith insurance Plaintiff he could not ask the adjuster whether he entered information about the claim in his claims notes and whether reviewing his notes would refresh his recollection.  What the Court did direct was that neither witness was required to produce additional documents to Hunter at the depositions.

the dreaded – and always improper – "you can answer if you know" instruction,[7] and numerous improper "form" objections on the basis that a question was "vague," "vague and overbroad," "very vague," "way too vague" and "I don't understand what you asked there."[8]

After enduring Barry's interruptions for a while, Hunter finally halted the deposition to call the Court. Discussing that telephone call at the August 1 hearing, the Court asked Barry whether he heard the Court instruct him during that call to limit all future objections to "Objection, form." (Rec. doc. 61, pp. 5-8). Barry stated that he did hear that instruction and followed it for the remainder of the deposition. (*Id.*). The Court sees things differently.

Less than one page after the telephone discussion with the Court, the following exchange took place:

---

[7] *See, e.g.*, pp. 23, 24, 26, 27, 32. "Instructions to a witness that they may answer a question "if they know" or "if they understand the question" are raw, unmitigated coaching, and are <u>never</u> appropriate." *Cincinnati Insurance Co. v. Serrano*, No. 11-CV-2075, 2012 WL 28071 at *5 (D. Kan. Jan. 5, 2012)(emphasis in original).

[8] *See, e.g.,* pp. 15, 13, 40, 27 and 98 respectively. "An objection that a question is 'vague' is usually, and in this instance was, a speaking objection disguised as a form objection. It essentially expresses a concern that the witness may not understand the question. Only the witness knows whether [he] understands a question, and the witness has a duty to request clarification if needed." *Cincinnati Ins. Co.*, 2012 WL 28071 at *5; *see also Mazzeo v. Gibbons*, No. 08-CV-1387, 2010 WL 3020021 at *2 (D. Nev. Jul. 27, 2010), in which the presiding Magistrate Judge expressed her temptation to make the offending lawyers write the following "clearly established legal rules" on a blackboard 500 times:

> I will not make speaking, coaching, suggestive objections which violate Rule 30(c)(2). I am an experienced lawyer and know that objections must be concise, nonargumentative and non-suggestive. I understand that the purpose of a deposition is to find out what the witness thinks, saw, heard or did. I know that lawyers are not supposed to coach or change the witness's own words to form a legally convenient record. I know I am prohibited from frustrating or impeding the fair examination of a deponent during the deposition. I know that constant objections and unnecessary remarks are unwarranted and frustrate opposing counsel's right to fair examination. I know that speaking objections such as "if you remember," "if you know," "don't guess," "you've answered the question," and "do you understand the question" are designed to coach the witness and are improper. I also know that counsel's interjection that he or she does not understand the question is not a proper objection, and that if a witness needs clarification of a question, the witness may ask for the clarification.

Notably, Hunter duly advised Vincent early in the deposition that he should ask Hunter to rephrase any question that he (Vincent) did not understand. (Rec doc. 40-3 at p. 18).

(Brief recess for conference with Judge.)

BY MR. HUNTER:

Q  Let's do -- let's do this. All right. All right.  Now, speaking of which, let's talk about conversations between you and I that we had. Okay?  You -- you do recall having conversations with me; is that correct?

A  Yes, sir.

Q  Do you recall telling me after you issued the -- issued the first tender or about to issue the first tender, that -- that GEICO knew that they owed me a lot more money, but this tender is what we're sending to you now?

MR. BARRY:  Object to the form.

THE WITNESS:  Absolutely not.

BY MR. HUNTER:

Q  Absolutely not? Okay.  Do you keep a record of -- of the conversations?  Or do you take notes on conversations that you -- that you had with me?

A  Very general notes, yes, sir.

Q  Okay.  When you say general, what do you mean?

A  I mean, I don't verbatim but...

Q  So you don't -- you don't say verbatim what our conversation was about?

A  Correct.

Q  Okay.  So and you don't recall having any conversations with me stating that you were aware that GEICO owed more money?

MR. BARRY:  Let me object to the form and instruct him not to answer that question, and I'm going to tell you why.

MR. HUNTER:  That's all you need to do:  Instruct him not to answer.  I'm going to reserve my right to recall the witness on that question. Okay?

MR. BARRY:  No, I'm going to...

MR. HUNTER:  And when -- once I file my motion, I'll reserve my right.  Now, the next question.

MR. BARRY: I'm going to...

MR. HUNTER: Next question.

MR. BARRY:  I didn't -- I didn't...that doesn't mean you're going to terminate what I have to say.  Your question is an improper question.  You're asking him the question akin to: When did you stop beating your wife?  So it presupposes something.  I don't think that that's -- that -- maybe that's not what you meant, but that's what you asked.  So I'm objecting to that.  And it's also going to -- I object to the form, and I object that it's asked and answered.  If you do not want to clarify it or correct it, then that's on you.  I'm not instructing him or making a comment about it.

MR. HUNTER:  Do you...

MR. BARRY:  I'm just saying the form is incorrect, and I'm explaining what about the form I believe to be incorrect.

MR. HUNTER:  Which is a speaking objection.

MR. BARRY:  It's not.

A  (No response.)

BY MR. HUNTER:

Q  What -- okay.  One more and I'm getting the Judge back on the phone about the speaking objections.  All right.

MR. BARRY: The Judge can read what I just said:  Object to the form because I believe it's an improper form.  And I explained what about the form is improper; to allow you to re-ask the question if you wanted to, to correct the issue about the form.

A  (No response.)

(Rec doc. 40-3 at pp. 87-90).

Well, the Court has now read what Barry said and the Court is not pleased. Mere seconds after being told directly by the Court to limit his objections to "Objection, form" Barry launched into a lengthy speaking objection and an improper instruction to the witness not to answer the question.[9]

The result of all this is a virtually unusable deposition transcript.

It bears repeating that "[c]onduct that is not permissible in the courtroom during the questioning of a witness is ordinarily not permissible at a deposition ...." *Bordelon Marine,* 2011 WL 164636 at *5. "The Federal Rules of Evidence contain no provision allowing lawyers to interrupt the trial testimony of a witness to make a statement. Such behavior should likewise be prohibited at depositions, since it tends to obstruct the taking of the witness's testimony." *Hall v. Clifton Precision, a Div. of Litton Systems, Inc.,* 150 F.R.D. 525, 530-531 (E.D. Pa. 1993).

The Court simply cannot accept that someone with Barry's experience could think of getting away with this sort of conduct in a courtroom with a judge presiding. In his zeal to defend his client's adjuster, Barry apparently lost sight of a core concept:

> The underlying purpose of a deposition is to find out what a witness saw, heard, or did—what the witness thinks. A deposition is meant to be a question-and-answer conversation between the deposing lawyer and the witness. There is no proper need for the witness's own lawyer to act as an intermediary, interpreting questions, deciding which questions the witness should answer, and helping the witness to formulate answers. The witness comes to the deposition to testify, not to indulge in a parody of Charlie McCarthy, with lawyers coaching or bending the witness's words to mold a legally convenient record. It is the witness—not the lawyer—who is the witness. As an advocate, the lawyer is free to frame those facts in a

---

[9] Rule 30 allows an attorney to instruct a witness not to answer a question "only when necessary to preserve a privilege, to enforce a limitation ordered by the Court, or to present a motion under Rule 30(d)(3)." Barry was doing none of these things – he was ostensibly making a "form" objection.

> manner favorable to the client, and also to make favorable and creative arguments of law. But the lawyer is not entitled to be creative with the facts. Rather, a lawyer must accept the facts as they develop.

*Hall,* 150 F.R.D. at 528.

Barry ran afoul of these precepts in the Vincent deposition. And while Hunter ascribes Barry's conduct to an alleged strategy to "prolong Mr. Vincent's deposition to prevent the corporate representative's testimony" because the 30(b)(6) deposition was scheduled to follow Vincent's (rec. doc. 40-1 at p. 2), the Court is unconvinced that such a "strategy" motivated Barry's actions.

The Court does not believe it necessary to divine Barry's motivations. It suffices to say that in his zeal to defend his client and to protect what he believed was privileged information, he was far too aggressive. As noted above, Barry sincerely apologized to his opponent and to the Court and acknowledged that the Vincent deposition was not his "proudest moment." The Court credits Barry's assumption of responsibility but is nonetheless compelled to take steps to correct the state of affairs that resulted from his commandeering of the Vincent deposition. Those steps will be discussed below.

### C. *The 30(b)(6) (Holland) Deposition*

Hunter also complains that the 30(b)(6) designee, Holland, was unprepared to testify in accordance with the notice. GEICO, through Barry, responds that Hunter terminated the deposition on his own after only 25 minutes, without complaining on the record that Holland was unprepared. While the transcript does reflect that Hunter ended the deposition after 25 minutes without any indication that he was dissatisfied with Holland's preparation, there are issues in the deposition that cause the Court serious concern.

First, going back to the Vincent deposition, which took place immediately before Holland testified, Barry repeatedly offered Hunter "reminders" to "use your time wisely" because the Federal Rules of Civil Procedure only allow for seven hours of deposition-taking per day.  (Rec. doc. 40-3 at pp. 141, 167).  At the very outset of the Holland deposition, he repeated that reminder:  "MR. BARRY:  The second thing is, under Rule 30 you can't be required to -- deposition can't last longer than seven hours in one day.  We started this morning with Mr. Vincent's deposition at nine a.m.  We didn't take any breaks.  It's now after 3:00.  That leaves Mr. Hunter with one hour to complete this corporate deposition." (Rec. doc. 40-4 at p. 9).

Second, Rule 30 does not say what Barry claimed it says.  Rather, the rule imposes a presumptive limit of seven hours <u>per deposition</u>, not per day of depositions.  Notwithstanding this fact, Barry insisted at the commencement of the Holland deposition that Hunter only had an hour to complete the 30(b)(6) deposition.  When considering the content of the deposition, then, the Court will not ignore the environment created by Barry when he insisted that Hunter had to complete the entire 30(b)(6) deposition in an hour on the last day before the expiration of the discovery deadline.

As noted earlier, GEICO initially resisted Hunter's efforts to obtain a 30(b)(6) deposition, requiring him to file a motion to compel.  (Rec. doc. 13).  In its opposition to that motion as to the propriety of the corporate deposition, GEICO argued that the Court should:

> limit the scope of the requested deposition to those issues made necessary by the controlling law in the case.  Many of the areas of inquiry listed in the Notice of Deposition are vague in the extreme and request information that bears no relevance and has no evidentiary value whatsoever.  This boilerplate notice is no more than an impermissible fishing expedition by which plaintiff hopes to gain information that has no relationship to the claims or defenses of the parties to this suit.

(Rec. doc. 16 at pp. 7-8).

The Court agreed that the notice was too broad and reformed the notice after the hearing on Hunter's motion without the necessity of GEICO filing its own motion for protective order. (Rec. doc. 26).

The Court ordered the deposition to go forward on the following topics:

> GEICO General Insurance Company (GEICO) is requested to designate the person or persons most knowledgeable and prepared to address the following topics:
>
> I.    Tilton R. Hunter, Jr.'s UIM claim against GEICO, including:
>
>     A.  The identity of all local, district, regional or home office employees or agents who acted in a supervisory or decision-making capacity regarding the handling of plaintiff's UIM claim;
>
>     B.  Actions that each agent, employee, or representative took in processing plaintiffs UIM claim;
>
>     C.  <u>Any and all claim file materials</u> including field file and the master file, log notes, reserve history, colossus work sheets, dissection reports, SIU documentation, Pacman notes, case notes, evaluations, worksheets or any other documentation related to use of colossus or other claims software on plaintiffs claim, any internal memoranda, electronic mail, or correspondence between or among the claims handling personnel, and any supervisor personnel and/or any attorneys before suit was filed;
>
>     D.  <u>Evaluation of plaintiff's UIM claim</u>, including:
>
>         i.    Method of calculations for tenders paid;
>
>         ii.    Reasonableness of tenders paid in full settlement of his UIM claim;
>
>         iii.    <u>Method of valuation of claim</u>;

      iv.      <u>Value of claim</u>; and

      v.      Withholding of full value to secure full and final releases.

II.      GEICO' s documents, policies, and procedures, including:

    A. Philosophies and policies regarding claims handling policies, providing service to policy holders, good/bad faith claim handling practices, extra contractual damages and suits, compliance with unfair claims practices statutes, wrongful claims handling, and employee handbooks or orientation materials;

    B. Claims manuals or training manuals by whatever name known, or other materials that address the handling of liability or UIM claims;

    G. All policies, during the time in which plaintiffs claim was originally evaluated, which in any manner ties any employees, including management, compensation, benefits or hope of advancement to their ability to reduce claim payments or lower the combined ratio;

    I.      Goals, training, or meetings for claims adjustors.

(Rec. docs. 26, pp. 2-3<br>(emphasis added); 13, pp. 7-8).

Against the one-hour time limit unilaterally imposed by Barry and the emphasized areas of inquiry set out above, the Court considers the following testimony:

Q  Okay. Okay. Were you in any way involved in my claim?

A  I had a conference call with the adjuster and our counsel regarding your claim.

Q  Okay. But you didn't do any of the -- let me strike that.  Did you review any of the -- the information in the claim, meaning the medical records or the -- or the tenders issued or anything like that?

MR. BARRY: Object to the form.

THE WITNESS:  I reviewed what the adjuster conveyed to me during the conference call.

BY MR. HUNTER:

Q  Okay. So did you review the claim file?

A  No.

. . . .

Q  Now, are you aware of the -- have you seen or have you had an opportunity to review the file before today's deposition?

A  No.
. . . .
Q  So do you know anything about this case that Mr. Vincent hadn't told you?

MR. BARRY: Object to the form.

COURT REPORTER: Hadn't told you?

A  (No response.)

BY MR. HUNTER:

Q  Yeah, right, hadn't -- had not told you.

A  No.

(Rec. doc. 40-4 at pp. 13-16)(emphasis added).

This testimony establishes that the individual designated as most knowledgeable about the topics in the deposition notice, including Hunter's claim and the claim file, did not review the claims file in preparation for the deposition and knew nothing about the claim that the adjuster had not told her in the single conference call conducted to prepare her to testify.  No amount of argument will convince the Court that this was a properly prepared

corporate designee. This is _especially_ true when one considers that, as recently as June 27, 2018, GEICO provided the following supplemental response to Hunter's interrogatory:

> **INTERROGATORY NO. 10:**
>
> Identify (name, address, and telephone number) all local, district, regional or home office employees or agents of GEICO who assisted, in any way, in the handling of this claim or acted in the supervisory fashion and the handling of Plaintiff's UIM claim.
>
> **AMENDED ANSWER TO INTERROGATORY NO. 10**:
>
> Pursuant to the Court's June 13, 2018 Order to identify those persons in a supervisory or decision-making position who handled plaintiff's UM claim, those persons are: Charlene Melvin, Adam Vincent, <u>Cheryl Holland</u>, and Brock Holukoff.
>
> (Rec. doc. 40-6)(emphasis added).[10]

Based upon Holland's testimony, this is not an accurate statement. She testified that neither Vincent nor his supervisor had approached her about Hunter's claim until she spoke to Vincent to prepare for the deposition. So, not only was Holland unprepared to speak about the claims file, GEICO's interrogatory response misled Hunter into believing that, at least, she had had some involvement in the "handling" of the claim.

In addition to these issues, when she was asked a question about the reserves in this case, Holland was instructed not to answer based on GEICO's claim of privilege and this Court's "rulings in the past." (Rec. doc. 40-4 at p. 13). For reasons explained in more detail below, while the Court does not find this to be an improper instruction based on the underlying circumstances and the Court's previous rulings, it is clear based on the totality of the circumstances that Hunter's ability to obtain the information and testimony to which he

---

[10] Vincent verified the accuracy of this response in a separate verification. (Rec. doc. 40-5).

is entitled was compromised.  For that reason and as explained more fully below, the Court will order the 30(b)(6) deposition of GEICO to be reconvened.

## III.  LAW AND ANALYSIS OF GEICO'S PRIVILEGE CLAIMS

As noted above, the Court earlier ordered certain documents that had been withheld by GEICO on claims of privilege to be submitted for *in camera* review.  The documents included a set of documents denominated "Claim Notes" in GEICO's privilege log.  (Rec. doc. 13-4 at p. 31). After its *in camera* review, the Court found that <u>all</u> of the documents were properly withheld. (Rec. doc. 33).  As a result of that ruling, the Vincent and Holland depositions went forward with Hunter having no access to the GEICO Claim Notes with which to question either deponent.  The current dispute concerning the Vincent and Holland depositions arose in large part because Hunter continued to seek information about the adjustment of his claims from GEICO witnesses and Barry continued to resist any reference at all to the Claim Notes.

After reading the Vincent transcript, the Court became concerned that it had inappropriately limited the discovery that Hunter was entitled to and ordered, *sua sponte*, that the Claim Notes only[11] be re-submitted to the Court for *in camera* review and that the parties fully brief whether GEICO's claims of privilege over those documents were well-taken.

The Court has considered the parties' supplemental briefs and the applicable law, as well as the testimony of Vincent and, for the following reasons, finds that it should not have allowed the Claim Notes to be withheld.

### A.  *Relevant Law on Attorney-Client Privilege*

The burden of demonstrating the applicability of both the attorney-client privilege and the work-product privilege rests on the party who invokes those privileges.  *Hodges, Grant &*

---

[11]  There were 20 separate documents listed on GEICO's privilege log.  (Rec. doc. 13-4 at p. 31).  The only document the Court revisited was the first, "Claim Notes."  (*Id.*).

*Kaufmann v. United States*, 768 F.2d 719, 721 (5th Cir. 1985).  Here, it is GEICO's burden to demonstrate that either the attorney-client privilege or work-product immunity is applicable to the Claim Notes.

On the issue of attorney-client privilege in this diversity action, the Court must look to Louisiana law.  *Paulsen v. State Farm Insurance Company*, No. 06-CV-9546, 2008 WL 11353752 at *1 (E.D. La. Apr. 24, 2008); *Biggers v. State Farm Ins. Co.*, No. 92-CV-2004, 1993 WL 408375 at *1 (E.D. La. Oct. 5, 1993)(Clement, J.)(holding that Louisiana law applied to determine questions of attorney-client privilege in a case alleging an insurer's bad faith). Louisiana courts hold that the purpose of the attorney-client privilege "is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice."  *Succession of Smith v. Kavanaugh*, 513 So. 2d 1138, 1142 (La. 1987).

Under Louisiana law, the proponent of a claim of attorney-client privilege must establish:  (1) the holder of the privilege is or sought to become a client; (2) the communication was made to an attorney or his subordinate in a professional capacity; (3) the communication was made outside the presence of strangers; (4) the communication was made to obtain a legal opinion or services; and (5) the privilege has not been waived.  *Cacamo v. Liberty Mut. Fire Ins. Co.*, 798 So. 2d 1210, 1216 (La. App. 4th Cir. 2001), *writ denied*, 807 So.2d 844 (La. 2002); *see also* La. Code Evid. Art. 506 (2006).  The attorney-client privilege extends to representatives of a client, as well as the clients themselves.  La. Code Evid. Art. 506(B); *see also Kimpton Hotel & Rest. Group, Inc. v. Liberty Mut. Fire Ins. Co.*, 974 So. 2d 72, 77 (La. App. 4th Cir. 2007).  A client's representative is defined as:

    (a) A person having authority to obtain professional legal services, or to act on advice so obtained, on behalf of the client.

    (b) Any other person who makes or receives confidential communication for the purpose of effectuating legal representation for the client, while acting in the scope of employment for the client.

La. Code Evid. Art. 506(A)(2).

The party seeking to assert the privilege bears the burden of proving that it applies. *Cacamo*, 798 So. 2d at 1216. A claim that the privilege applies must be adequately substantiated and cannot be a blanket assertion of coverage. *Id.*

### B. *Analysis of GEICO's Attorney-Client Privilege Claims*

In its privilege log, GEICO states that the Claim Notes are "[p]rivileged as documents prepared in anticipation of litigation, work product and containing the mental impressions and evaluations of claims adjusters." (Rec doc. 13-4 at p. 31). While this verbiage does not expressly invoke the attorney-client privilege, it is nonetheless clear to the Court from its *in camera* review that certain information contained in the Claim Notes is, on its face, subject to that privilege.

By way of example, there are numerous entries that repeat or recapitulate Barry's case evaluation and advice to GEICO about the litigation. Hunter is clearly not entitled to this content and the Court will not order its production, notwithstanding the arguable deficiency in GEICO's attorney-client privilege claim in its log and in its briefing.

### C. *Relevant Law on the Work-Product Privilege*

Rule 26(b)(3) of the Federal Rules of Civil Procedure governs the disclosure of documents prepared in anticipation of litigation and provides:

> Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent). But, subject to Rule 26(b)(4), those materials may be discovered if:
>
> > (i)  they are otherwise discoverable under Rule 26(b)(1); and
> >
> > (ii)  the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.

Fed. R. Civ. P. 26(b)(3).

As with the attorney-client privilege, the burden of showing that documents are work product falls on the party seeking to protect the documents from discovery. *St. James Stevedoring Co., Inc. v. Femco Machine Co.*, 173 F.R.D. 431, 432 (E.D. La. 1997). The work-product doctrine shields materials prepared by or for an attorney in preparation for litigation. *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385 (1947); *Blockbuster Entertainment Corp. v. McComb Video, Inc.*, 145 F.R.D. 402, 403 (M.D. La. 1992).

It is well-established, however, that the work-product doctrine "is not an umbrella that shades all materials prepared by a lawyer ..." *El Paso,* 682 F.2d at 542; *see also Piatkowski v. Abdon Callais Offshore, L.L.C.*, No. 99-CV-3759, 2000 WL 1145825 at *2 (E.D. La. Aug. 11, 2000). The doctrine focuses only on materials assembled and <u>brought into being</u> in anticipation of litigation. *Piatkowski*, 2000 WL 1145825 at *2 (emphasis added). Excluded from work-product protection are materials assembled in the ordinary course of business. *El Paso*, 682 F.2d at 542.

In determining whether a document was "brought into being" in anticipation of litigation, the primary focus is on the reason or purpose for creating the document. *Beal v. Treasure Chest Casino*, No. 98–CV-0786, 1999 WL 461970 at *3 (E.D. La. July 1, 1999). The Fifth Circuit has described the standard for determining whether a document has been prepared in anticipation of litigation as follows:

> It is admittedly difficult to reduce to a neat general formula the relationship between preparation of a document and possible litigation necessary to trigger the protection of the work product doctrine. We conclude that litigation need not necessarily be imminent, as some courts have suggested, as long as the <u>primary motivating purpose</u> behind the creation of the document was to aid in possible future litigation.
>
> *United States v. Davis*, 636 F.2d 1028, 1039 (5th Cir. Unit A), *cert. denied*, 454 U.S. 862, 102 S.Ct. 320 (1981)(citations omitted) (emphasis added); *accord In re Kaiser Alum. & Chem. Co.*, 214 F.3d 586, 593 (5th Cir. 2000), *cert. denied*, 532 U.S. 919, 121 S.Ct. 1354 (2001).

Factors that courts rely on to determine the primary motivation for the creation of a document include the retention of counsel and counsel's involvement in the generation of the document and whether it was a routine practice to prepare that type of document versus whether the document was instead prepared in response to a particular circumstance. *See Piatkowski*, 2000 WL 1145825 at *2; *Electronic Data Systems Corp. v. Steingraber*, No. 02-CV-0225, 2003 WL 21653414 (E.D. Tex. July 9, 2003). However, the mere fact that a defendant anticipates litigation resulting from an incident does not automatically insulate investigative reports from discovery as work-product. *Carroll v. Praxair, Inc.*, No. 05-CV-0307, 2006 WL 1793656 (W.D. La. Jun 28, 2006); *see also Janicker v. George Washington Univ.*, 94 F.R.D. 648, 650 (D.D.C.1982) ("The fact that a defendant anticipates the contingency of litigation

resulting from an accident or an event does not automatically qualify an 'in house' report as work product.").  "If the document would have been created regardless of whether litigation was also expected to ensue, the document is deemed to be created in the ordinary course of business and not in anticipation of litigation." *Piatkowski*, 2000 WL 1145825 at *2 (emphasis added).[12]  With these concepts in mind, the Court turns to the Claim Notes withheld by GEICO.

### D.  Analysis of GEICO's Work-Product Claims

When the Court originally ordered production of the Claim Notes for its review *in camera*, it ordered only that "Defendant is to provide the Court, for purposes of an *in camera* inspection, with the documents identified in its privilege log." (Rec. doc. 26)  It did not order any supplemental briefing or additional explanation by GEICO as to why the documents were subject to protection as work-product, relying only on the minimal argument set forth in GEICO's original opposition to Hunter's motion to compel.  In so doing, the Court did not hold GEICO to its burden of establishing that the "primary motivating purpose behind the creation of the document was to aid in possible future litigation."  *Davis*, 636 F.2d at 1039.  This was error by the Court, as is now demonstrated not only by Vincent's subsequent testimony but by the

---

[12] In this regard, Wright and Miller provides:

> Prudent parties anticipate litigation, and begin preparation prior to the time suit is formally commenced.  Thus the test should be whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation.  But the converse of this is that even though litigation is already in prospect, there is no work-product immunity for documents prepared in the regular course of business rather than for purposes of the litigation.

> Wright & Miller, Fed. Pract. & Proc. § 2024 (1994)(footnotes omitted).

absence of any evidence or meaningful argument in GEICO's supplemental brief to support the privilege claim.

GEICO's argument in its opposition regarding the Claim Notes was brief:

> GEICO has sent to plaintiff the entire claim file except for those documents listed in the Privilege Log. Regardless of the documents plaintiff seeks, *Broussard v. State Farm Mutual Automobile Ins. Co.*, 519 So.2d 136 (La. 1980) makes clear that under no circumstances should the work product of attorneys for GEICO or other such privileged information, be produced. Furthermore, information as to 'reserves' is irrelevant and is not calculated to result in discoverable information.

(Rec. doc. 16 at p. 6).

Its supplemental brief added nothing to this contention, repeating the argument based on *Broussard* and failing to provide any statement, declaration, or affidavit of a witness with knowledge attesting to the primary motivating purpose behind the creation of the Claim Notes. (*See id.*).

GEICO's bare argument and reliance on a 38-year-old, one-paragraph *per curiam* is insufficient to carry its burden in light of countervailing evidence.[13] So is the suggestion in GEICO's brief that the mere fact that the claimant was a lawyer should automatically insulate

---

[13] The Court will not decline this rare opportunity to quote the <u>entirety</u> of the *Broussard* case that GEICO relies upon:

> Writ granted. The judgments of the court of appeal and the district court are reversed. Blanket production of the attorney's and insurer's files is not permitted. The plaintiff is free to renew her discovery requests upon identifying the documents or types of documents she seeks. If any such requested documents are those prepared in anticipation of litigation, those documents should not be produced unless the plaintiff makes the showing required by La.Civ.Code Proc. art. 1422. In all events, documents which contain the opinions, conclusions, theories or mental impressions of the defendant's attorney as well as privileged communications are not discoverable.
>
> *Broussard v. State Farm Mut. Auto. Ins. Co.*, 519 So. 2d 136 (La. 1980).

his entire claims file from discovery because insurance companies always expect litigation when the insured claimant is an attorney. The Claim Notes themselves reveal on their face that much of the information therein is of a sort that would be kept in the normal course of business, documenting the adjuster's routine conversations with the insured. The majority of the entries predate the retention of counsel by GEICO and lack any indicia that counsel was involved in the generation of the document. *See Piatkowski*, 2000 WL 1145825 at *2. And, Vincent's testimony more than establishes that his entries in the Claim Notes were routine – he actually testified that he keeps no handwritten notes and that all the information he gathers from the insured is entered by him into the computer system, *i.e.*, the Claim Notes. (Rec. doc. 540-3 at pp. 32-35).

Having received supplemental briefing and argument on the matter and having thoroughly reviewed Vincent's own testimony about his and GEICO's adjustment and recordkeeping practices, the Court is convinced that it should have ordered the Claim Notes produced before the Vincent and Holland depositions. That the Court did not do so contributed substantially to the problems the parties experienced in those depositions and that precipitated the motions now before the Court. The Court will not permit this error to prejudice Hunter in his efforts to obtain the discovery – both documents and testimony – to which he is entitled.

This includes information concerning reserves. In two briefs, the entirety of GEICO's argument for withholding information about reserves is: "information as to 'reserves' is irrelevant and is not calculated to result in discoverable information" (rec. doc. 16 at p. 6) and "it is without question that the reserve information was prepared in the course and

scope of anticipation of litigation and is subject to both the attorney client privilege and the work product privilege." (Rec. doc. 56 at p. 11).

The first argument is easily addressed – there is ample authority in this district holding that reserve information is discoverable where, as here, a claim of bad faith is asserted. *See, e.g.*, *Pinnacle Medical Servs., Inc. v. Hanover Ins. Co.*, No. 06-CV-8227, 2008 WL 11353743 at *3 (E.D. La. Feb. 28, 2008)("While the reserves are merely statutorily-mandated estimates for accounting purposes, they are nevertheless relevant, as they are valuations made by the insurers themselves which provide the Court with insight into the insurer's subjective assessment of the liability."); *Culbertson v. Shelter Mut. Ins. Co.*, No. 97-CV-1609, 1998 WL 743592 at *1 (E.D. La. Oct. 21, 1998); *First National Bank of Louisville v. Lustig*, No. 87-CV-5488, 1991 WL 236839 (E.D. La. Oct. 31, 1991) and 1993 WL 411377 (E.D. La. Oct. 5, 1993).

As for GEICO's claims of privilege, the Court disagrees that the applicability of either the attorney-client or work-product privilege "is without question," as GEICO suggests; far from it. Nothing in this record or in the Claims Notes themselves establishes that any attorney played a role in setting reserves in this case, nor is there any evidence presented that reserves in this case were set by GEICO primarily because it anticipated litigation. In fact, common sense and experience teaches otherwise – setting and altering reserves is a matter of routine for insurers such as GEICO. Simply saying otherwise is not nearly enough to carry the burden of establishing work-product protection here.

IV.   CONCLUSION

The problems that led us to this point are many. The Court should have ordered production of the Claim Notes before the Vincent and Holland depositions so that Hunter and

the witnesses were prepared to inquire and testify respectively about their content and the facts underlying that content. Barry's conduct in the Vincent deposition in attempting to avoid any discussion of those underlying facts exacerbated the initial problem, as did Barry's insistence that the 30(b)(6) deposition could only last one hour.

As noted above, the Court finds that, of the hundreds of objections lodged by Barry in the Vincent deposition, many were without legal basis or were otherwise unnecessary or excessive. The frequency and length of the interruptions clearly impeded, delayed, and frustrated a fair examination of the deponent. However inappropriate this conduct was, however, the Court does not believe that a sanction against Barry or GEICO would be just under the circumstances, given the role that the Court's decision not to order production of the GEICO Claim Notes played in this saga and given Barry's sincere acknowledgement that he was overly zealous in defense of his client. The Court therefore declines to sanction Barry for his conduct in the Vincent deposition, but it cannot decline to admonish him concerning the impropriety of that conduct and advise him that any future similar conduct will be met with harsh consequences.

Based upon all the foregoing, then, the Court will order that the Claim Notes identified on GEICO's privilege log be produced no later than seven days from the issuance of this Order and Reasons. The Court has redacted the Claim Notes to withhold from production information it deems subject to the attorney-client privilege and has provided the redacted documents to Barry for his production to Hunter.

The Court further orders that Vincent will be deposed anew. Questions about setting or changing reserves and other information on that topic will be allowed. There will be no objection lodged to a question that was asked and answered, because the original transcript

is so muddled with interruptions that the Court doubts any of it would be of actual use at trial or in opposing a dispositive motion. The Plaintiff in this case is entitled to a clean deposition of the individual who adjusted his claim, and he will get it.

Likewise, the 30(b)(6) deposition will be reconvened, and GEICO is directed, pursuant to that Rule, to designate and prepare a witness to testify knowledgeably about <u>all</u> the topics allowed by this Court to be explored in that deposition, including reserves.

As to the location and costs of these follow-up depositions, they will take place in the Greater New Orleans area and the costs associated with them will be borne by GEICO, unless otherwise agreed to by counsel. Mr. Hunter has already been made to travel to Georgia and pay a court reporter for the Vincent and Holland depositions, both of which are now to be reconvened through no fault of his.

A few final words. GEICO and Barry complained both in brief and at oral argument that, in the lead up to the two GEICO depositions, Hunter had routinely emailed the Court and GEICO's counsel concerning discovery disputes, which GEICO argued is not "proper procedure to resolve discovery disputes." (Rec. doc. 51 at p. 5). The Court disagrees. Hunter's choice to reach out to the Court in lieu of filing multiple discovery motions is sanctioned by Rule 16 of the Federal Rules of Civil Procedure ("The scheduling order may. . . direct that before moving for an order relating to discovery, the movant must request a conference with the court") and is wholly consistent with Rule 1, which provides that all the Rules of Civil Procedure "should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and

proceeding." This Court has also published its own "Civil Practice Guidelines," available to all counsel,[14] which expressly provide for such pre-motion practice.

Finally, there is the matter of Hunter's request that the Court take "judicial notice" that GEICO's witness committed perjury. This is, of course, a frivolous request. It is based upon a convoluted series of suppositions and conclusions that, while they may be grist for the mill on cross examination of the witness, do not fairly amount to anything approaching perjury.[15] The request is an obvious outgrowth of an atmosphere in the case and between the lawyers that became unduly contentious, if not toxic.

Counsel are hereby reminded that the Eastern District of Louisiana has adopted the Code of Professionalism of the Louisiana Bar Association, which requires that counsel conduct themselves with "dignity, civility, courtesy and a sense of fair play" and clearly does not countenance baseless accusations, *ad hominem* attacks, or similarly obnoxious conduct. The Court urges counsel to re-acquaint themselves with the provisions of this Code and to conduct themselves professionally when dealing with each other and this Court. The Court is entitled to expect nothing less.

New Orleans, Louisiana, this __12th__ day of _____September_____, 2018.

_____
MICHAEL B. NORTH
UNITED STATES MAGISTRATE JUDGE

---

[14] *See* http://www.laed.uscourts.gov/sites/default/files/pdfs/north/Civil_Practice_Guidelines.pdf
[15] And it should go without saying that Courts in civil cases do not take judicial notice that perjury (a crime) has been committed during the litigation.